**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

MICHAEL PALMER,

        Plaintiff,

    v.

RICHARD ROBBINS, JAMES WINSTON,
and OFFICER CHRISTOPHER MCBRIDE,

        Defendants.

CIVIL ACTION NO.: 4:19-cv-167

## O R D E R

     This matter is before the Court on Defendants James Winston and Christopher McBride's Motion for Summary Judgment.  (Doc. 30.)  Plaintiff Michael Palmer filed this 42 U.S.C. § 1983 suit asserting claims for malicious prosecution under the Fourth Amendment against James Winston, Christopher McBride, and Richard Robbins; malicious prosecution under Georgia law against Winston; and "racial discrimination in violation of the Fourteenth Amendment" against Robbins.[1]  (See doc. 8.)  Plaintiff alleges that Defendants violated his Fourth Amendment rights through their participation in a police investigation concerning the theft of gasoline from Herty Advanced Materials Development Center.  (See id.)  Winston and McBride now move for summary judgment on the Fourth Amendment malicious prosecution claim asserted against McBride and the state law malicious prosecution claim asserted against Winston.  (Doc. 30.)  Plaintiff filed a Response, (doc. 33), and Winston and McBride filed a Reply, (doc. 43).  For the reasons explained below, the Court **GRANTS** the Motion for Summary Judgment.  (Doc. 30.)

---

[1]  In a previous Order, the Court dismissed the Fourth Amendment malicious prosecution claim against Winston and the Fourteenth Amendment racial discrimination claim against Robbins.  (See doc. 17.)

# BACKGROUND

## I.     Factual Allegations

This Section 1983 action arises out of an investigation of gasoline theft from Herty Advanced Materials Development Center (hereinafter "Herty"), a division of Georgia Southern University (hereinafter "GSU"), in Savannah, Georgia.  (See doc. 33-2, p. 2; see also doc. 30-2, p. 1; doc. 33-1, pp. 1–2.)  On November 22, 2016, Defendant Richard Robbins, the plant manager at Herty, contacted Defendant Christopher McBride, a lieutenant with the GSU Police Department's Criminal Investigations Division, about the possible theft of gasoline from Herty's 300-gallon gas tank.  (Doc. 33-2, pp. 1–3.)  Robbins informed Lieutenant McBride that a surveillance camera recorded footage of three Herty employees using one of Herty's gas pumps to fuel their personal vehicles.  (Id. at p. 3.)  Lieutenant McBride then visited Herty and viewed the surveillance footage.[2]  (Id. at pp. 3–4.)

The Video is dated November 16, 2016, and its time stamp runs from 18:10:00 to 18:17:00.[3]  (See Video.)  Based on the Court's own viewing, the Video depicts an individual

---

[2]  Defendants attached the video that Robbins believed depicted Plaintiff to the Motion for Summary Judgment as Exhibit 2.  (See doc. 31 (the "Video"); see also doc. 30-11, p. 2.)

[3]  Plaintiff argues that "[t]he footage attached by Defendants as Exhibit 2 is not properly authenticated because it is not specific enough as to what part of the surveillance video it refers to."  (Doc. 33-1, p. 2.)  Thus, Plaintiff argues, the video "cannot form the basis for a motion for summary judgment."  (Id.)  However, Plaintiff does not cite to any legal authority in support of this assertion.  (See id.)  Furthermore, the Court finds that Defendants did properly authenticate the Video.  "In order for the court to consider certain evidence on a motion for summary judgment, the evidence must be admissible at trial or capable of being presented in admissible form at trial."  McDowell v. Wal-Mart Stores, Inc., No. 3:05cv435/MCR/EMT, 2006 WL 3498139, at *2 (N.D. Fla. Dec. 4, 2006) (citing Fed. R. Civ. P. 56(e); Denney v. City of Albany, 247 F.3d 1172, 1189 n.10 (11th Cir. 2001)).  "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  Such evidence includes the testimony of a witness with knowledge that the "item is what it is claimed to be" and evidence concerning "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."  Fed. R. Evid. 901(b)(1), (4).  Here, Defendants assert that Exhibit 2 is the video footage viewed by Winston and Robbins when they identified Plaintiff.  (Doc. 43, p. 7, n.2.)  In his Affidavit, Winston stated, "Attached hereto as Exhibit 2 is a true and correct copy of

driving a pickup truck in reverse towards a gas tank and then parking the truck near the gas tank. (Video 00:00–00:02.)  The individual then exits the truck via the driver's door and jogs off screen towards the Herty building.  (Id. at 00:02–00:12.)  The individual appears to be wearing a dark colored shirt and light-colored pants, and the truck appears to be a dark-colored, four-door pickup truck with running boards.  (Id.)  The individual then reappears on screen and walks through and around Herty's parking lot before jogging back over to the truck and gas tank.  (Id. at 01:22–02:20.)  The individual proceeds to manipulate the gas tank and begin pumping gas into the truck. (Id. at 02:20–02:53.)  After a couple minutes pass, the individual appears to remove the gas pump's nozzle from the truck and return it to the gas pump.  (Id. at 04:45–04:53.)   The individual subsequently enters the truck through the driver's door and drives the truck to a nearby parking spot.  (Id. at 05:00–05:23.)  After parking the truck, the individual exits the truck, walks across the Herty parking lot, and enters the Herty building through a door.  (Id. at 05:23–06:07.)  Though not depicted on screen, the individual must have exited the building a different way as he next

---

the surveillance camera video footage that I viewed when I identified [Plaintiff] using the Herty Center gas pumps to fuel his personal vehicle."  (Doc. 30-12, p. 2.)  Similarly, in their Affidavits, Lieutenant McBride and Robbins stated, "Attached hereto as Exhibit 2 is a true and correct copy of the surveillance camera footage of the November 16, 2016, incident."  (Doc. 30-10, p. 4; doc. 30-11, p. 4.)  McBride and Robbins also stated in their Affidavits that the video footage "recorded *on the night* of November 16, 2016, shows an individual . . . pump gas into [a] vehicle."  (Doc. 30-10, p. 2; doc. 30-11, p. 2 (emphasis added).)  The Video is dated November 16, 2016, and the time stamp shows that the recording occurred at night, running from 18:10:00 to 18:17:00. (See doc. 31.)  Thus, the Court finds that Defendants properly authenticated the Video.  Compare United States v. Hodges, 616 F. App'x 961, 966–67 (11th Cir. 2015) ("The Government presented evidence sufficient to establish that the videos and photographs were what the Government claimed they were: videos retrieved from the seized computer or external hard drive found[] in Hodges' house and photographs produced from the videos.  Two witnesses with knowledge testified as to the contents and circumstances of the videos and photographs.  The contents of the videos and photographs also support a finding that they were taken from a computer or external hard drive found in Hodges' house.") and United States v. Glawson, 322 F. App'x 957, 960 (11th Cir. 2009) ("The evidence [was] properly . . . authenticated: the government offered the exhibit as a picture of the person Early identified as Terry Glawson, and Early testified that the picture looked like the person she knew as Terry Glawson.") with Snover v. City of Starke, 398 F. App'x 445, 449 (11th Cir. 2010) (finding that the defendant failed to properly authenticate a DVD by submitting the DVD without a supporting affidavit).

reappears on the screen walking into the parking lot from around an outside corner of the Herty building.  (Id. at 06:37–07:00.)  The individual then walks across the parking lot and enters the truck through the driver's door.  (Id.)  Furthermore, while the incident occurred during the night, several exterior lights illuminate the gas tank and the Herty building's surrounding area.  (See id.)

After viewing the Video, Robbins told Lieutenant McBride that he believed the individual depicted therein was Plaintiff Michael Palmer, a Herty employee.  (Doc. 33-2, pp. 5–6.)  Robbins informed Lieutenant McBride that he could identify Plaintiff based on Plaintiff's physical characteristics as well as the truck, which Robbins claimed belonged to Plaintiff.  (Id. at p. 6.)  At this point in time, Robbins had worked with Plaintiff for several years and was familiar with Plaintiff's physical appearance and truck.[4]  (Id. at pp. 6–7.)  Furthermore, after viewing the Video, Lieutenant McBride believed the truck depicted therein was a dark color, such as a "dark gray or blue or possibly maybe [sic] any shade of green."  (Doc 30-3, p. 80; see also doc. 30-10, p. 2.)  Moreover, as an employee, Plaintiff had access to and was familiar with Herty's facilities and how to use Herty's gas pumps.  (Doc. 33-2. p. 7.)  After viewing the Video, Robbins and Lieutenant McBride met with Herty's executive director, Don McLemore (who is not a party to this suit), to report the GSU Police Department's investigation into the gasoline theft.  (Id. at p. 8.)  In addition, Lieutenant McBride documented his visit to Herty by writing an Incident Report.  (Doc. 30-7.)  Notably, the Incident Report stated that "[t]he video did not show a clear view of [Plaintiff's] face[]" but "Robbins was able to recognize [Plaintiff] by [his] vehicle and [his] individual body characteristics/mannerisms."  (Id. at p. 3.)

---

[4]  Plaintiff argues that he "drove several different vehicles and [that] . . . Robbins was not familiar with all of the vehicles" he drove.  (Doc. 33-2, p. 6.)  However, Plaintiff testified during his deposition that while he had access to several different vehicles at the time, the only truck he owned or operated at that time was a brown, four door GMC Sierra 1500 with running boards.  (Doc. 30-5, pp. 38–40.)  Therefore, it is unclear how Plaintiff's access to multiple vehicles would make it unreasonable for Robbins to associate Plaintiff with the one truck that he was always driving and to believe that was Plaintiff's truck.

On a later date, Lieutenant McBride interviewed Plaintiff in a vacant office at Herty.  (Doc. 33-2, pp. 8–9.)  According to Plaintiff's deposition testimony, only Robbins, Lieutenant McBride, a secretary, and himself were at Herty during his interview.  (Doc. 30-5, pp. 52–53.)  According to the Follow Up Case Report written by Lieutenant McBride, the actual interview with Plaintiff did not reveal any helpful information.  (See doc. 30-8, p. 2.)  However, after the interview concluded and Plaintiff left Herty, Lieutenant McBride noticed that Plaintiff drove a truck that "appeared to be very similar or identical to the vehicle seen in the surveillance footage."  (Doc. 30-10, p. 3; see also doc. 30-3, pp. 44–45; doc. 30-8, p. 2.)

After completing the interview, Lieutenant McBride asked Robbins if another Herty employee could view the Video and identify the employee and truck depicted therein.  (Doc. 33-2, pp. 11–12.)  Robbins then approached Defendant James Winston about reviewing the Video.  (Id. at p. 12.)  Winston viewed the Video in Robbins' office and later signed a written statement declaring that he identified Plaintiff as the employee pumping gas into the truck.[5]  (Id. at p. 13.)  The entire interaction between Winston and Robbins regarding the Video occurred within Herty's facilities during Winston's normal working hours on December 2, 2016.  (Doc. 33-2, p. 15.)  At the time Winston viewed the Video and signed the written statement, he served as a team leader at Herty, supervised twelve to fifteen employees (including Plaintiff), and oversaw the manufacturing process.  (Doc. 30-4, p. 164; doc. 30-6, pp. 7, 16; doc. 33-2, pp. 12–13.)  However, the parties dispute the extent to which Winston was responsible for disciplinary matters related to the

---

[5]  The parties dispute who prepared the written statement.  According to Defendants, Winston viewed the surveillance footage, prepared the statement himself, signed the statement in his office, and hand-delivered the signed statement to Robbins.  (Doc. 33-2, pp. 14–15.)  According to Plaintiff, Robbins prepared the written statement for Winston, which Winston later signed.  (Id. at p. 15.)  However, the parties agree that Lieutenant McBride did not consult with Winston regarding the signed statement's contents or assist in the preparation of the statement.  (Id.)

employees he supervised.  (See doc. 33-2, pp. 12–13.)  According to Plaintiff, Winston's responsibilities focused on the manufacturing process and extended to handling employees' tardiness.  (Id. at p. 12.)  However, Winston testified during his deposition that he had "some disciplinary responsibilities for the people . . . under [his] supervision," including reporting employees who misused Herty property. (Doc. 30-6, pp. 75–76.)  Furthermore, Plaintiff does not dispute that GSU policy requires supervisors to monitor the conduct of their employees and investigate and report potential employee misconduct, including theft of GSU property.  (Doc. 33-2, p. 19.)

After receiving Winston's signed statement, Robbins emailed it to Lieutenant McBride. (Id. at p. 16.)  GSU Police Chief Laura McCullough (who is not a party to this suit) presented the evidence gathered by the investigation to GSU administration officials, and Chief McCullough informed Lieutenant McBride that the GSU administration decided to pursue criminal charges against Plaintiff.[6]  (Id. at pp. 16–17.)  Because GSU police officers' arrest powers do not extend to off-campus properties such as Herty, Lieutenant McBride contacted Detective Matthew Russell (who is not a party to this suit) with the Savannah Chatham Metro Police Department ("SPD") to relay the details of the investigation and to request assistance securing the arrest warrant for Plaintiff.  (Id. at p. 17.)  Detective Russell then asked Lieutenant McBride to send him the case file, (id. at pp. 17–18), which—according to Lieutenant McBride—included "old incident reports, investigative reports, photos, and . . . the video," (doc. 30-3, p. 101).  Detective Russell later informed Lieutenant McBride that he obtained arrest warrants for Plaintiff and would arrange for

---

[6] The parties dispute who at GSU made final decisions regarding the investigation, discipline, termination, or criminal prosecution of Herty employees.  (See doc. 33-2, pp. 19–20.)  According to Defendants, GSU's administration and human resources department made those decisions.  (Id. at p. 19.)  However, Plaintiff has presented evidence showing that Robbins has "de-facto authority" on every "major issue" because the GSU administration often "rubber stamps" Robbins' decisions.  (Id. at pp. 19–20.)

the warrant service teams to serve them.  (Doc. 33-2, p. 18.)  On February 2, 2017, the Pooler Police Department arrested Plaintiff pursuant to the warrant obtained by Detective Russell and the SPD.  (Id. at p. 19.)

## II.   Procedural Background

Plaintiff filed this suit in the Superior Court of Chatham County on May 23, 2019, alleging violations of his Fourth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983 and violations of Georgia law.  (See doc. 1-1.)  Defendants subsequently removed the case to this Court pursuant to 28 U.S.C. § 1446, (doc. 1, pp. 1–2), and Plaintiff then filed an Amended Complaint, (doc. 8.)  Specifically, Plaintiff alleges a Fourth Amendment malicious prosecution claim against Robbins (Count I); a Fourteenth Amendment racial discrimination claim against Robbins (Count I); a Fourth Amendment malicious prosecution claim against McBride (Count II); a Fourth Amendment malicious prosecution claim against Winston (Count III); and a malicious prosecution claim pursuant to O.C.G.A. § 51-7-40 against Winston (Count IV).  (Id. at pp. 9–16.)  Defendants filed a Motion to Dismiss, (doc. 10), and the Court subsequently dismissed the Fourth Amendment malicious prosecution claim against Winston (Count III) and the Fourteenth Amendment racial discrimination claim against Robbins (part of Count I).  (See doc. 17.)  Winston and McBride filed this Motion for Summary Judgment on February 12, 2021, seeking summary judgment on the Georgia law malicious prosecution claim asserted against Winston (Count IV) and the Fourth Amendment malicious prosecution claim asserted against McBride (Count II).  (See doc. 33-1.)  Plaintiff filed a Response, (doc. 33), and McBride and Winston filed a Reply, (doc. 43).

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).  However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "[T]he mere existence of some alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (emphasis and citations omitted).

## DISCUSSION

### I.    Fourth Amendment Malicious Prosecution Claim against Lieutenant McBride

Count II of the Amended Complaint asserts a Fourth Amendment malicious prosecution claim against Lieutenant McBride.  (Doc. 8, p. 11.)  Lieutenant McBride moves for summary judgment on this claim, arguing that: (1) there is no evidence that he caused any seizure of Plaintiff that violated the Fourth Amendment; (2) Plaintiff's arrest was supported by probable cause or, at minimum, arguable probable cause; and (3) he did not institute or continue the criminal prosecution against Plaintiff or unduly influence the decision to prosecute.  (Doc. 30-2, pp. 8–15.)

### A.    Applicable Law

#### 1.    Qualified Immunity

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).  "Qualified immunity is intended to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law."  Hoyt v. Cooks, 672 F.3d 972, 977 (11th Cir. 2012) (quotations and citations omitted).  As a result, qualified immunity "liberates government agents from the need to constantly err on the side of caution by protecting them both from liability and the other burdens of litigation, including discovery."  Holmes v. Kucynda, 321 F.3d 1069, 1077 (11th Cir. 2003) (internal quotation marks omitted).  But qualified immunity does

not protect an official who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff." Id. (internal quotation marks and alteration omitted) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982)).

To rely upon qualified immunity, a defendant first must show that he acted within his discretionary authority. Mobley v. Palm Beach Cnty. Sheriff Dep't, 783 F.3d 1347, 1352 (11th Cir. 2015). Specifically, a defendant must show that he "was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004). Here, the record is replete with evidence that Lieutenant McBride was performing a legitimate job function through permissible means when he investigated the gasoline theft at Herty. (See generally doc. 33-2); see also, e.g., Grider v. City of Auburn, 618 F.3d 1240, 1267–68 (11th Cir. 2010) (noting that police investigations and arrests are usually considered discretionary functions); McDowell v. Gonzalez, 424 F. Supp. 3d 1214, 1224 (S.D. Fla. 2019) ("Defendants' challenged actions concerned their investigation into the alleged tip theft and Plaintiff's subsequent arrest while they were on duty as police officers acting pursuant to the performance of their duties. Thus, Defendants in this case 'readily satisfied [the discretionary authority] requirement, as they undertook all the challenged actions while on duty as police officers conducting arrest and investigative functions.'") (quoting Hinson v. Bias, 927 F.3d 1103, 1116 (11th Cir. 2019)).

Thus, the Court must grant Lieutenant McBride qualified immunity unless Plaintiff has shown (a) a violation of the Constitution by Lieutenant McBride, (b) the illegality of which was clearly established at the time of the incident. Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010) (citations omitted). The Court has discretion in deciding which of those two prongs to

address first.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).  Here, the parties dispute whether Plaintiff sufficiently showed that Lieutenant McBride's involvement with Plaintiff's arrest and prosecution violated the Fourth Amendment.  (See doc. 30-2, pp. 8–15; doc. 33-1, pp. 8–16.)

2.    **Fourth Amendment**

To establish a viable claim under the Fourth Amendment for malicious prosecution, a plaintiff must prove (1) the elements of the common law tort of malicious prosecution and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures.  See Wood v. Kesler, 323 F.3d 872, 881 (11th Cir. 2003).  As to the first prong, a plaintiff must show he endured: "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused."  Id. at 882; see also Green v. City of Lawrenceville, 745 F. App'x 881, 883 (11th Cir. 2018) (per curiam) (quoting Kjellsen v. Mills, 517 F.3d 1232, 1237 (11th Cir. 2008)).

Regarding the second prong, a plaintiff must adduce evidence to prove "he was 'seized . . . in violation of [his] constitutional rights.'"  Donley v. City of Morrow, 601 F. App'x 805, 813 (11th Cir. 2015) (per curiam) (quoting Kingsland v. City of Miami, 382 F.3d 1220, 1235 (11th Cir. 2004)).  "[A]n arrest is a seizure of the person," and "the reasonableness of an arrest is . . . determined by the presence or absence of probable cause for the arrest[;]" it is well-established that "an officer who arrests an individual without probable cause violates the Fourth Amendment." Skop v. City of Atlanta, 485 F.3d 1130, 1137 (11th Cir. 2007) (internal citations and quotation marks omitted).  Thus, "[t]he absence of probable cause is a necessary element" for both prongs of a malicious prosecution claim.  Brock v. City of Zephyrills, 232 F. App'x 925, 928 (11th Cir. 2007) (per curiam).  Said differently, "the existence of probable cause" for an arrest or arrest

warrant "defeats a [Section] 1983 malicious prosecution claim." Grider, 618 F.3d at 1256; see also Black v. Wigington, 811 F.3d 1259, 1267 (11th Cir. 2016) ("[A] police officer cannot be liable for malicious prosecution if the arrest warrant was supported by probable cause.").

Furthermore, "[t]o receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause." Grider, 618 F.3d at 1257; see also Swanson v. Scott, 334 F. Supp. 3d 1203, 1215 (M.D. Fla. 2018) ("[T]he 'arguable probable cause' standard is used to determine qualified immunity for malicious prosecution [Section] 1983 claims.") (citing Grider, 618 F.3d at 1257). Thus, "qualified immunity is not lost when all the evidence available to the officer establishes at least arguable probable cause, even if this evidence is not listed in an affidavit." Carter v. Gore, 557 F. App'x 904, 909 (11th Cir. 2014).

### B.     Whether There Was a Seizure in Violation of the Fourth Amendment

Lieutenant McBride first argues that there is no evidence that he caused Plaintiff to be seized in violation of the Fourth Amendment. (Doc. 30-2, p. 9.) To prove a violation of his Fourth Amendment right to be free of unreasonable seizures, Plaintiff must "establish (1) that the legal process justifying his seizure was constitutionally infirm; and (2) that his seizure would not otherwise be justified without legal process." Williams v. Aguirre, 965 F.3d 1147, 1165 (11th Cir. 2020); see also Luke v. Gulley, 975 F.3d 1140, 1144 (11th Cir. 2020). Plaintiff "can prove that his arrest warrant was constitutionally infirm if he establishes either that the officer who applied for the warrant should have known that his application failed to establish probable cause, or that an official, *including an individual who did not apply for the warrant*, intentionally or recklessly made misstatements or omissions necessary to support the warrant." Aguirre, 965 F.3d at 1165 (emphasis added) (citations omitted).

According to Lieutenant McBride, "there is no evidence [that he made] a material misstatement or omission . . . in support of the arrest warrant." (Doc. 30-2, p. 10.) The Court agrees. Although there is evidence to support a finding that Robbins lied to Lieutenant McBride when he identified Plaintiff in the Video, (see id. at p. 10, n.1), Plaintiff admits that "there is no evidence that [Lieutenant] McBride knew about the lies perpetrated by . . . Robbins," (doc. 33-1, p. 4). Thus, even assuming that Robbins' identification of Plaintiff was false, it cannot serve as the basis of Plaintiff's Fourth Amendment malicious prosecution claim against Lieutenant McBride. See Williams v. Miami-Dade Police Dep't, 297 F. App'x 941, 948 (11th Cir. 2008) ("McIntosh and Carey are entitled to qualified immunity for claims arising out of Williams' possession of a kilogram of cocaine and claims arising out of Williams' alleged drug purchase. There is no evidence that either McIntosh or Carey had reason to doubt the validity of Baaske's representations . . . ."); Ermini v. Scott, 249 F. Supp. 3d 1253, 1275 (M.D. Fla. 2017) ("There is no evidence that the statement Mapes fired first was known to be false by Det. Murphy when made in the Affidavit, or that it was a reckless misrepresentation."); Isom v. Bulso, No. 8:18-cv-2035-MSS-SPF, 2020 WL 6481113, at *9 (M.D. Fla. Sept. 29, 2020) ("[N]o reasonable jury could conclude that Bulso acted with 'reckless disregard for the truth' when he included in the warrant affidavits the statement that Palmeri had identified Isom as the suspect. There is no evidence that, when he signed the warrant affidavits, Bulso knew (or should have known) that Palmeri had misidentified Isom.").

Moreover, nothing in the record indicates that Lieutenant McBride made an intentional or reckless misstatement or omission necessary to obtain the arrest warrant. Indeed, the record shows that Lieutenant McBride investigated the gasoline theft, (see doc. 33-2), created a case file, (doc. 30-3, pp. 98, 101), and gave that case file to Detective Russel so that Detective Russel could obtain

an arrest warrant, (id. at p. 98).  According to Lieutenant McBride's deposition testimony, the case

file included "old incident reports, investigative reports, photos, and . . . the [V]ideo."  (Id. at p.

101.)  Notably, Lieutenant McBride acknowledged the Video's shortcomings in the Incident

Report.  (See doc. 30-7, p. 3.)  Specifically, Lieutenant McBride stated that the Video "did not

show a clear view" of Plaintiff's face and noted that Robbins positively identified Plaintiff based

upon the truck and "individual body characteristics/mannerisms" of the person in the Video.  (Id.)

Furthermore, Lieutenant McBride included the Video in the case file he gave to Detective Russell.

(Doc. 30-3, p. 101.)  On these facts, the Court cannot conclude that McBride intentionally or

recklessly made any misstatements or concealed or omitted any exculpatory evidence.  See Stefani

v. City of Grovetown, 780 F. App'x 842, 851 (11th Cir. 2019) ("Stefani fails to offer proof that

Nalley deliberately or recklessly misstated the evidence or omitted any clearly material fact. . . .

[T]he magistrate was not misled about facts material to the probable cause determination.").

        Indeed, the only intentional or reckless misstatement or omission Plaintiff argues that

Lieutenant McBride made is that he concealed the fact that he saw "similar trucks . . . during his

visit at Herty." (Doc. 33-1, p. 9; see also id. at p. 14 ("McBride had an occasion to view the Herty

parking lot after he interrogated [Plaintiff] and observe several other trucks there that also had four

doors and running boards.").)  However, Plaintiff did not cite to any evidence indicating that trucks

similar to Plaintiff's truck were actually in the Herty parking lot when McBride interviewed

Plaintiff.[7]  (See generally doc. 33-1.)  In fact, the evidence in the record suggests that no other

trucks were in the parking lot the day Lieutenant McBride visited Herty to interview Plaintiff given

that, based on Plaintiff's deposition testimony, the only people present at Herty during his

---

[7] Plaintiff asserts that several other Herty employees owned four-door trucks with running boards.  (Doc. 35, pp. 15–22.)  However, Plaintiff failed to present evidence showing that these employees' trucks were at Herty the day McBride interviewed Plaintiff.  (See id.; see also doc. 33-1.)

interview were Robbins, McBride, a secretary, and Plaintiff because "[the plant] was on Christmas break." (Doc. 30-5, pp. 51–52.) Additionally, even if other trucks were at Herty during the interview, Plaintiff failed to cite to any evidence showing that Lieutenant McBride saw the trucks. See Stefani, 780 F. App'x at 851 ("As for the 'key exculpatory information' Stefani claims Nalley deliberately omitted, some of this information was not known to him when he applied for the warrants. . . . So he could not have 'intentionally' omitted it when appearing before the magistrate."). Thus, the Court finds that Plaintiff failed to show that McBride intentionally or recklessly misstated or omitted information necessary to support the arrest warrant for Plaintiff. Accordingly, Plaintiff cannot show that Lieutenant McBride caused him to be seized in violation of the Fourth Amendment.

### C.   Probable Cause & Arguable Probable Cause

Lieutenant McBride further argues that he is entitled to summary judgment because probable cause or, at minimum, arguable probable cause existed for the issuance of the arrest warrant and Plaintiff's arrest. (Doc. 30-2, pp. 12–15.) Probable cause is present where the "facts and circumstances within the collective knowledge of law enforcement officers . . . would cause a prudent person to believe that the suspect has committed or is committing an offense." Craig v. Singletary, 127 F.3d 1030, 1042 (11th Cir. 1997). "[P]robable cause is a flexible and fluid concept[] that looks . . . to the totality of the circumstances to determine the reasonableness of the officer's belief that a crime has been committed." Paez v. Mulvey, 915 F.3d 1276, 1286 (11th Cir. 2019). "Probable Cause 'is not a high bar.'" Id. (quoting District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018)).

"*Arguable* probable cause exists where 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants *could have believed* that probable cause existed

to arrest Plaintiff.'"  Grider, 618 F.3d at 1257 (emphasis added); see also Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997) (arguable probable cause exists when "the facts and circumstances [are] such that the officer reasonably could have believed that probable cause existed").  "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity."  Wood, 323 F.3d at 878; see also Grider, 618 F.3d at 1257 ("[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable.").  "The standard is an objective one and does not include an inquiry into the officer's subjective intent or beliefs."  Grider, 618 F.3d at 1257; see also Swint v. City of Wadley, 51 F.3d 988, 996 (11th Cir. 1995) ("[W]e determine whether reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed.") (quotations omitted).  The question of "whether an officer possesses arguable probable cause depends on the elements of the alleged crime and the operative fact pattern."  Grider, 618 F.3d at 1257.  However, "showing arguable probable cause does not . . . require proving every element of a crime."  Id.  Under Georgia law, "a person commits the offense of theft by taking when he unlawfully takes or . . . unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated."  O.C.G.A. § 16-8-2.

Lieutenant McBride asserts that "the record establishes that there was sufficient information to warrant a reasonable belief that [Plaintiff] had committed the offense of theft by taking."  (Doc. 30-2, pp. 13–14.)  Specifically, Lieutenant McBride points to Robbins and Winston's identification of Plaintiff in the Video, the similarities between the truck depicted in the Video and Plaintiff's truck, and Plaintiff's access to and familiarity with Herty.  (Id.)  Plaintiff

responds that the Video cannot be the basis for probable cause or arguable probable cause because its "quality is too poor for Robbins []or Winston[] to reliably identify" Plaintiff.  (Doc. 33-1, p. 12.)  Plaintiff also argues that the comparison between his truck and the truck depicted in the Video is insufficient to establish arguable probable cause because "there are hundreds of thousands of trucks of numerous makes and models produced each year that have four doors, running boards and [which] are [painted] some variety of 'dark' color."  (Id. at p. 13.)

Here, the Court finds that probable cause or, at minimum, arguable probable cause existed for the issuance of the arrest warrant and Plaintiff's arrest.  First, two of Plaintiff's supervisors, Robbins and Winston, communicated to Lieutenant McBride that the Video depicted Plaintiff pumping gas into his personal vehicle, the truck.  (Doc. 33-2, pp. 5–7, 13, 16.)  Though evidence exists showing that Robbins and Winston lied to Lieutenant McBride about identifying Plaintiff, (see doc. 30-2, p. 10 n.1), there is no evidence indicating that Lieutenant McBride had reason to doubt Robbins and Winston's statements.  Indeed, Plaintiff admits as much.  (Doc. 33-1, p. 4 ("[T]here is no evidence that [Lieutenant] McBride knew about the lies perpetrated by . . . Robbins and Winston . . . .).)  Furthermore, Plaintiff's argument that the Video's poor quality should have made McBride aware that Robbins' identification was unreliable, (doc. 33-1, p. 12), is unavailing. While the Court's own review of the Video reveals that the depicted individual's face is not identifiable, the Video's quality would not necessarily prevent a reasonable officer from believing that Robbins and Winston could identify Plaintiff based on his physical characteristics, mannerisms, and his truck, especially since Robbins and Winston had worked with Plaintiff for multiple years and were familiar with his physical appearance and the vehicle he drove.  (Doc. 33-2, pp. 6–7, 14.)  Thus, the Court finds that "a reasonable officer[] in the same circumstances and possessing the same knowledge" as Lieutenant McBride could conclude that Robbins and

Winston's identifications of Plaintiff were reliable and trustworthy.  Swint, 51 F.3d at 996; see also Banks v. Bostic, No. 17-13986, 2018 WL 1158306, at *2 (11th Cir. Jan. 10, 2018) ("Under our case law, an eyewitness's identification of a perpetrator is ordinarily sufficient to establish probable cause for an arrest.") (citing Rushing v. Parker, 599 F.3d 1263, 1268 (11th Cir. 2010)); Holland v. City of Auburn, 657 F. App'x 899, 904 (11th Cir. 2016) ("Generally, an officer is entitled to rely on a victim's criminal complaint as support for probable cause."); Mears v. McCulley, 881 F. Supp. 2d 1305, 1321 (N.D. Ala. July 19, 2012) ("[E]ven a rough description of the perpetrator of a crime may create arguable probable cause to arrest a person who matches that description.").

Additional evidence further supports a finding of probable cause or arguable probable cause.  After interviewing Plaintiff, Lieutenant McBride noticed that Plaintiff left in a truck Lieutenant McBride believed was "very similar" to the truck he saw in the Video.  (Doc. 30-3, p. 45.)  Specifically, McBride noticed that Plaintiff drove a four-door, dark-colored pick-up truck with running boards that, based on the truck's silhouette, was made by GMC or Chevrolet.  (Doc. 30-3, pp. 79–80.)  While this fact alone might not be enough to establish probable cause, the totality of the circumstances support a finding of at least arguable probable cause.  See Mack v. Mazzarella, 554 F. App'x 800, 803 (11th Cir. 2014) ("Additional evidence supports the district judge's finding [the officer] had arguable probable cause.  Mack was apprehended in a light-blue, older-model Chrysler, which was similar to the gray, older-model Chrysler [that, according to an eyewitness, was] used in the KFC robbery.").  Furthermore, one can reasonably infer that the individual depicted in the Video was familiar with the Herty facility because he pumped gas from the Herty gas tank, walked around the Herty facility, and entered the Herty building.  Plaintiff matches this description as he was a Herty employee who was familiar with Herty's facilities and

knew how to operate the gas pump. Looking at the totality of the circumstances, even in the light most favorable to Plaintiff, the Court concludes that probable cause (and, at a minimum, arguable probable cause) existed for the issuance of the arrest warrant and Plaintiff's arrest. See Brock, 232 F. App'x at 928 ("[P]robable cause existed for the issuance of the arrest warrant. The physical descriptions given by the witnesses matched Brock who also owned a vehicle of the same make and color as that of the getaway vehicle. Two of the three witnesses identified Brock in the initial photo line-up, and several of Brock's family members identified Brock as the man in the security camera photograph."); see also Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006) ("To determine whether arguable probable cause exists, courts must look to the totality of the circumstances.").

### D.     Institution or Continuation of Criminal Proceeding against Plaintiff

Finally, Lieutenant McBride argues that there is no evidence showing that he instituted or continued the criminal prosecution against Plaintiff, which is essential in order for Plaintiff to show that he violated Plaintiff's Fourth Amendment rights through a malicious prosecution. (Doc. 30-2, pp. 11–12.) According to Lieutenant McBride, GSU administration officials made the decisions to investigate Plaintiff and to pursue criminal charges, SPD officers applied for the arrest warrant, and a neutral judge issued the warrant for Plaintiff's arrest. (Id. at p. 11.) Lieutenant McBride asserts that these were "intervening acts" that "[broke] the chain of causation" between his involvement in the investigation and Plaintiff's arrest. (Id.) Lieutenant McBride also asserts that "there is no evidence indicating that [he] gave information that he knew to be false and so unduly influenced the authorities." (Id. at p. 12.) Plaintiff responds that Lieutenant McBride is not absolved of liability because (1) the GSU administration "acted based on information Lieutenant McBride gathered and provided through [his] investigation" and (2) Lieutenant McBride "[sought]

arrest and assist[ed] in prosecution where he should have known there was no probable cause—regardless of who asked him to do so."  (Doc. 33-1, p. 15.)

The Eleventh Circuit has stated that, under federal law, a defendant is not the legal cause of a prosecution or other criminal proceeding where "there [is] no evidence [the defendant] had anything to do with the decision to prosecute or that [the defendant] had 'improperly influenced' that decision."  Williams v. Miami-Dade Police Dep't, 297 F. App'x at 947 (quoting Eubanks v. Gerwin, 40 F.3d 1157, 1160–61 (11th Cir. 1994)).  Put another way, the "intervening acts of the prosecutor, grand jury, judge, and jury . . . break the chain of causation *unless* plaintiff can show that these intervening acts were the result of deception or undue pressure by the defendant[s]."  Barts v. Joyner, 865 F.2d 1187, 1195 (11th Cir. 1989) (emphasis added).

As an initial matter, Plaintiff does not cite to, and the Court is not aware of, any evidence indicating that Lieutenant McBride was responsible for the decision to prosecute Plaintiff.  Indeed, the undisputed evidence shows that Chief McCullough "presented the evidence gathered by GSU's investigation to university administration officials."  (Doc. 33-2, pp. 16–17.)  Furthermore, Chief McCullough later informed Lieutenant McBride "that GSU administration officials had decided to pursue criminal charges" against Plaintiff.  (Id. at p. 17.)  Even if, as Plaintiff alleges, the GSU administration "rubber stamped" a decision by Robbins to pursue criminal charges, (id. at p. 20), Plaintiff does not assert that Lieutenant McBride himself made the decision to prosecute Plaintiff.  Indeed, the parties agree that Lieutenant McBride gave the case file to Detective Russell and "had no further involvement in applying for or obtaining the arrest warrant[]."  (Id. at p. 18.)  While Lieutenant McBride *investigated* the case and asked Detective Russell "to present the case [to a judge] as it was presented to him," (doc. 30-3, p. 100), nothing in the record shows that Lieutenant McBride initiated the *prosecution*.  See Clifton v. Jeff Davis County, No. 2:16-cv-108, 2019 WL

2385191, at *8 (S.D. Ga. June 5, 2019) ("While it is undisputed that . . . the actions of several Defendants initiated the *investigation* into Plaintiff's boring, it was the D.A.—not Defendants— who made the decision to initiate and carry out the *prosecution*, and Plaintiff has not shown that any Defendant had anything to do with that decision.") (citing Eubanks, 40 F.3d at 1161).

Furthermore, there is no evidence that Lieutenant McBride improperly influenced the decision to prosecute Plaintiff. While Defendants concede that evidence exists tending to show that Robbins and Winston lied to Lieutenant McBride when they identified Plaintiff in the Video, (see doc. 30-2, p. 10 n.1), Plaintiff admits that "there is no evidence that [Lieutenant] McBride knew about the lies perpetrated by . . . Robbins." (Doc. 33-1, p. 4.) Nonetheless, Plaintiff argues that Lieutenant McBride "knew or should have known that identification based on the number of doors on a truck, the presence of running boards and an unknown color that [cannot] be described with any more specificity than calling it 'dark' falls far short of a good faith or reasonable belief that the truck could have been identified by Robbins or Winston." (Id. at p. 14.) However, as discussed in Discussion Section I.B, supra, probable cause or, at minimum, arguable probable cause existed for the issuance of the arrest warrant and Plaintiff's arrest.

Additionally, as discussed in Discussion Section I.A, supra, there is no evidence indicating that Lieutenant McBride made an intentional or reckless misstatement or omission necessary to obtain the arrest warrant. Instead, Lieutenant McBride sent his case file, including the Video and incident reports, to Detective Russell. (Doc. 30-3, p. 101.) The Incident Report stated that "[the Video] did not show a clear view of [the depicted individuals'] faces." (Doc. 30-7, p. 3.) Thus, rather than omitting exculpatory evidence, the record shows that Lieutenant McBride fully apprised Detective Russell and the GSU administration with all the relevant information known to him. Thus, there is no evidence that Lieutenant McBride himself deceived Detective Russell, the

GSU administration, or the judge to obtain the arrest warrant or carry out Plaintiff's prosecution. See Eubanks, 40 F.3d at 1161–62 ("[N]one of the defendants were responsible for the decision to prosecute, and . . . none of them improperly influenced the decision to prosecute. They . . . fully apprise[d] the State Attorney of all relevant information known to them, including that which weighed for and against Eubanks' guilt."); Clifton, 2019 WL 2385191, at *8 ("[T]he record before the Court indicates that the condition of the road was a fact readily available to the D.A.  Deputy Taylor's investigative file, in its entirety, was given to the D.A.").

Based on the foregoing, the Court finds that Plaintiff failed to put forth sufficient evidence showing that Lieutenant McBride (1) instituted, continued, or improperly influenced Plaintiff's prosecution; (2) lacked probable cause for the issuance of the arrest warrant or Plaintiff's arrest; or (3) caused Plaintiff to be seized in violation of his Fourth Amendment rights, each an essential element of his malicious prosecution claim.  Furthermore, the Court finds that Plaintiff failed to put forth sufficient evidence showing that Lieutenant McBride lacked arguable probable cause. Therefore, the Court also finds that Lieutenant McBride is entitled to qualified immunity. Accordingly, the Court **GRANTS** the Motion for Summary Judgment as to the Fourth Amendment malicious prosecution claim asserted against Lieutenant McBride.  (Doc. 30.)

## II.    Malicious Prosecution Claims against Winston

### A.    State Law Malicious Prosecution Claim

Count IV of Plaintiff's Amended Complaint asserts a malicious prosecution claim against Winston pursuant to O.C.G.A. § 51-7-40.  (Doc. 8, p. 14–16.)  Winston argues that official immunity under the Georgia Tort Claims Act (hereinafter the "GTCA"), O.C.G.A. § 50-21-20, *et seq*, bars the state law malicious prosecution claim asserted against him.  (Doc. 30-2, pp. 15–20.) Pointing to his role as team leader and his supervisory responsibilities over Plaintiff, Winston

asserts that "[t]he facts uncovered in the course of discovery clearly demonstrate that [his] identification of [Plaintiff] was committed within the scope of his employment." (Id. at p. 17.) Plaintiff responds that official immunity does not protect Winston because Winston was not acting within the scope of his official duties of employment when identifying him in the Video. (Doc. 33-1, pp. 17–18.) According to Plaintiff, Winston's responsibilities at Herty were limited to "the production and manufacturing process." (Id. at p. 17.)

Under the GTCA, "[a] state officer or employee who commits a tort while acting within the scope of his or her official duties or employment is not subject to lawsuit or liability therefor." O.C.G.A. § 50-21-25(a). "The term 'scope of employment' under the GTCA has been broadly construed." Smith v. Hatcher, 516 F. Supp. 3d 1369, 1377 n.8 (S.D. Ga. 2021) (citing Ridley v. Johns, 552 S.E.2d 853, 855 (Ga. 2001)). However, the Act should not "be construed to give a state officer or employee immunity from suit and liability if it is proved that the officer's or employee's conduct was not within the scope of his or her official duties or employment." Riddle v. Ashe, 495 S.E.2d 287, 288 (Ga. 1998) (quoting O.C.G.A. § 50-21-25(a)). To determine if an employee acted within the scope of his authority, the Georgia Supreme Court has examined whether the employee was "performing the regular duties of [his] employment, during [his] regular hours of employment, at [his] regular site of employment." Shekhawat v. Jones, 746 S.E.2d 89, 93 (Ga. 2013); see also Lee v. Christian, 221 F. Supp. 3d 1370, 1382 (S.D. Ga. 2016) (considering an employee's regular duties, work hours, and workplace to determine whether the employee acted within the scope of employment under GTCA).

Here, the undisputed facts show that at the time Winston identified Plaintiff in the Video, Winston was working his normal shift during normal business hours at Herty.[8] (Doc. 33-2, p. 15;

---

[8] Plaintiff does not dispute that Winston, as an employee of Herty (a division of GSU), is a state employee for purposes of the GTCA.

doc. 30-4, pp. 163–64; doc. 30-6, pp. 76–77.)  Indeed, Winston testified during his deposition that he viewed the Video on a desktop computer located in Robbins' office during his "regular shift." (Doc. 30-6, pp. 76–77.)  The facts also show that, at the time Winston viewed the Video, he served as a team leader at Herty, was responsible for the supervision of twelve to fifteen employees (including Plaintiff), and oversaw the manufacturing process.  (Doc. 30-4, p. 164; doc. 30-6, pp. 7, 16; doc. 33-2, pp. 12–13.)  Furthermore, GSU policy requires supervisors to monitor the conduct of their employees and investigate and report potential employee misconduct, including the theft of GSU property.  (Doc. 33-2, p. 19.)  While Plaintiff asserts that Winston's supervisory duties were limited to the production and manufacturing process and "dealing with workers that were tardy," (doc. 33-1, p. 17), those responsibilities were only a portion of Winston's responsibilities. Indeed, Winston testified during his deposition that he had "some disciplinary responsibilities for the people . . . under [his] supervision," including reporting employees who misused Herty property.  (Doc. 30-6, pp. 75–76.)  Additionally, Winston testified in his deposition that it was his "right" to "make sure everything was . . . correct . . . [and] right" with the employees "[who] actually worked . . . under [him]."  (Doc. 30-6, pp. 41-42.)

Based on the foregoing, the Court finds that Winston was acting within the scope of his employment when he identified Plaintiff as the individual depicted in the Video.  See Shekhawat, 746 S.E.2d at 93 ("Appellants were acting within the scope of their employment with MCG.  Both physicians attested to this fact in sworn affidavits, and the evidence clearly reflects that both physicians were performing the regular duties of their employment, during their regular hours of employment, at their regular site of employment."); see also Davis v. Standifer, 621 S.E.2d 852, 855 (Ga. Ct. App. 2005).  Therefore, Winston is entitled to official immunity as to the state law malicious prosecution claim.  Accordingly, the Court **GRANTS** the Motion for Summary

Judgment as to Plaintiff's state law malicious prosecution claim asserted against Winston.  (Doc. 30.)

### B.    Federal Malicious Prosecution Claim

Because the Court has granted Winston summary judgment on the state law malicious prosecution claim, Plaintiff requests that the Court "reinstate" his federal malicious prosecution claim against Winston.[9]  (Doc. 33-1, p. 18.)   The Court previously dismissed that claim at the motion to dismiss stage because Plaintiff specifically alleged numerous facts requiring a finding that Winston, in reviewing the footage and identifying Plaintiff on the footage, was not acting pursuant to his job duties (or any power or authority granted to him by the state) and thus was not acting under the color of state law at that time.  (Doc. 17, pp. 5–7.)  As set forth in that Order, in ruling on the Motion to Dismiss, the Court was required to "accept[] [Plaintiff's] allegations in the complaint as true," Belanger v. Salvation Army, 556 F.3d 1153, 1155 (11th Cir. 2009) (citing Jackson v. BellSouth Telecomm., 372 F.3d 1250, 1262 (11th Cir. 2004)).  (Doc. 17, p. 4.)

According to Plaintiff, the federal malicious prosecution claim was pled in the alternative to the state law prosecution claim.  (Doc. 33-1, p. 18.)  However, Plaintiff's Amended Complaint did not plead alternative versions of the facts relating to the issue of whether Winston was acting under the color of state law, and instead consistently alleged facts indicating that Winston was *not*. (See doc. 1-1.)  Even after the Court issued its Order dismissing the federal claim and after the parties had a chance to conduct discovery, Plaintiff never sought to amend his Amended Complaint and attempt to "reinstate" his federal malicious prosecution claims.  And even in the face of Winston's Motion for Summary Judgment on the remaining state law malicious prosecution claim,

---

[9] Plaintiff claims that qualified immunity would not apply to the federal claim "[d]ue to the ample evidence that . . . Winston knowingly lied in his identification of Plaintiff."  (Doc. 33-1, p. 18.)

Plaintiff opted against filing a formal motion to amend his Amended Complaint, choosing instead to include in his Response a request for "reinstatement" of the federal malicious prosecution claim, though only in the event Winston was granted summary judgment on the state law malicious prosecution claim.  (Doc. 33-1, p. 18.)

While "[n]o provision exists in the Federal Rules of Civil Procedure for 'reinstating' previously dismissed claims," Restaurant Teams Int'l, Inc. v. Dominion Cap. Fund Ltd., No. 99 Civ. 4138 RJWJCF, 2002 WL 1603150, at *1 (S.D.N.Y. July 18, 2002), most courts construe such a request as either a motion to amend the complaint pursuant to Federal Rule of Civil Procedure 15 or a motion for reconsideration.  See, e.g., Kirby v. Dallas Cnty. Adult Prob. Dep't, Civil No. 1:04-cv-844 DJS/ACT, 2010 WL 11627994, at *1 (D.N.M. Mar. 23, 2010) (construing motion to reinstate previously dismissed claims as a motion to amend the complaint); see also, e.g., Price v. White, Civil Action No. 5:13-CV-00076-TBR, 2014 WL 2154892, at *1 (W.D. Ky. May 22, 2014) (construing motion to reinstate previously dismissed claim as a motion for reconsideration).

Under Rule 15(a)(2), a party may amend its pleading with the Court's leave, and the Court should "freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, a court need not allow leave to amend "(1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile."  In re Engle Cases, 767 F.3d 1082, 1108–09 (11th Cir. 2014).  Moreover, "where a party's motion to amend is filed after the deadline for such motions, as delineated in the court's scheduling order, the party must show good cause why leave to amend the complaint should be granted."  Smith v. Sch. Bd. of Orange Cnty., 487 F.3d 1361, 1366 (11th Cir. 2007); see also Fed. R. Civ. P. 16(b)(4).

26

As an initial matter, Plaintiff failed to properly seek leave to amend his Amended Complaint and reinstate previously dismissed claims.  Instead of seeking leave to amend to add the federal malicious prosecution claim, Plaintiff asked the Court to reinstate this claim in his Response to the Motion for Summary Judgment.  (Doc. 30-2, pp. 18–19.)  "[A] plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment" as "the proper procedure for plaintiffs to assert a new claim" at the summary judgment stage "is to amend the complaint in accordance with [Rule 15(a)]."  Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004); see also Dunn v. Hart, No. 5:13-cv-131, 2016 WL 5661058, at *1 n.1 (S.D. Ga. Sept. 29, 2016) ("Plaintiff's responses primarily . . . reassert dismissed claims against dismissed defendants.  . . .  [However], Plaintiff may not resurrect previously dismissed claims . . . at [the summary judgment] stage.").  Furthermore, the Court notes that even if Plaintiff properly sought leave to amend his Complaint to reinstate the claim against Winston, the deadline to amend pleadings expired on June 1, 2020, (doc. 20), discovery closed on January 14, 2021, (doc. 28; see also doc. 29, p. 1), and the deadline to file civil motions expired on February 13, 2021, (doc. 28).  Thus, the Court is under no obligation to grant leave to amend when such undue delay and prejudice towards Winston would occur.  See Lowe's Home Ctrs., Inc. v. Olin Corp., 313 F.3d 1307, 1315 (11th Cir. 2002) ("[I]t is not an abuse of discretion for a district court to deny a motion for leave to amend following the close of discovery, past the deadline for amendments, and past the deadline for filing dispositive motions."); see also Mack, 554 F. App'x at 804 ("After the filing of responsive pleadings, and in the face of an imminent adverse ruling, district judges have wide discretion in deciding whether to grant leave to amend.").

In addition, Plaintiff did not attempt to make any showing of good cause as to why the Court should permit him—at such a late stage of the litigation—to amend his Complaint to add a

previously dismissed claim.  See Diaz v. Burchette, 585 F. App'x 968, 969–70 (11th Cir. 2014) ("[T]he district court did not abuse its discretion in denying Diaz's motion for leave to amend her complaint, filed over a year after the district court's deadline to amend pleadings and after AT & T had moved for summary judgment.  Diaz did not provide an explanation as to why she did not seek to amend her complaint . . . .  Nor did she make any showing of good cause . . . ."); Coleman v. Bowden, 797 F. App'x 422, 429 (11th Cir. 2019) ("At the time Mr. Coleman sought leave to amend, the district court had already permitted Mr. Coleman to amend the complaint once, the case had been pending for over two years, discovery had closed, and Sergeant Walker's motion for summary judgment was pending.  The district court noted that Mr. Coleman did not show good cause for the delay, and the motion to amend appeared to be designed solely to delay consideration of Sergeant Walker's summary judgment motion.  There are sufficient grounds to deny Mr. Coleman's motion.").  In sum, given the untimeliness of Plaintiff's request, the prejudice that would result to Defendants (with discovery closed and motions for summary judgment having been filed and fully briefed), and the failure to show good cause, the Court declines to provide Plaintiff with leave to amend his Amended Complaint.

To the extent Plaintiff seeks reconsideration of the Court's partial granting of Defendants' motion to dismiss, the Court reviews the request under Federal Rule of Civil Procedure 54(b), since that Order was interlocutory in nature.  Although the text of Rule 54(b) does not specify a standard by which courts evaluate motions, courts in this circuit "have taken the position that a motion for reconsideration should only be granted if there is (1) an intervening change in controlling law; (2) newly discovered evidence; or (3) the need to correct clear error or prevent manifest injustice."  Insured Deposits Conduit, LLC v. Index Powered Fin. Servs., LLC, No. 07-22735-CIV, 2008 WL 5691349, at *2 (S.D. Fla. Mar. 14, 2008); accord Bryant v. Jones, 696 F.

Supp. 2d 1313, 1320 (N.D. Ga. 2010). Because reconsideration "is an extraordinary remedy to be employed sparingly," the movant "must set forth facts or law of a strongly convincing nature to induce the Court to reverse its prior decision." Burger King Corp v. Ashland Equities, Inc., 181 F. Supp. 2d 1366, 1369, 1370 (S.D. Fla. 2002); accord Voter Verified, Inc. v. Election Sys. & Software, Inc., No. 6:09-cv-1969-Orl-19KRS, 2011 WL 3862450, at *2 (M.D. Fla. Aug. 31, 2011); see also Armbuster v. Rosenbloom, No. 1:15-cv-114, 2016 WL 1441467, at *1 (S.D. Ga. Apr. 11, 2016). "A motion for reconsideration should not be used to present the Court with arguments already heard and dismissed, or to offer new legal theories or evidence that could have been presented" before the original decision. S.E.C. v. Mannion, No. 1:10-cv-3374-WSD, 2013 WL 5999657, at *2 (N.D. Ga. Nov. 12, 2013); accord Armbuster, 2016 WL 1441467, at *1 ("[I]t is improper on a motion for reconsideration to ask the Court to rethink what the Court has already thought through – rightly or wrongly.") (citation and internal quotation marks omitted).

Here, Plaintiff does not argue that his federal prosecution claim should be reinstated because of an intervening change in law, the availability of new evidence, or the need to correct clear error or prevent manifest injustice. (See doc. 33-1, p. 18.) Instead, Plaintiff asserts that it should be reinstated because, he claims, he pled the claim "in the alternative" to the state malicious prosecution claim and if he cannot recover under state law because Winston was acting under color of law, then he should be able to recover under federal law. (Id.) It is understandable that—now that the Court has ruled that the evidence shows that Winston *was* acting under color of law— Plaintiff would want to be able to pursue the federal malicious prosecution claim that he had asserted in his Complaint. The fact of the matter, however, is that Plaintiff's Complaint alleged only facts indicating Winston was not acting under color of state law. While Plaintiff may have believed he was asserting alternative causes of action, he did not assert alternative facts to support

each one and, as a result, the Court was bound to accept the factual allegations as true and dismiss the federal claim.  Thus, the Court did not commit clear error or manifest injustice when it previously dismissed the federal claim.  Moreover, there is no change in the law or "new evidence" requiring reconsideration of the dismissal, which was based on failure to state a claim. Accordingly, there are no grounds to reconsider the dismissal, particularly at this late stage of the litigation, where reconsideration would cause undue prejudice to the Defendants.

In sum, Plaintiff's request to "reinstate" a claim comes too late and lacks the necessary showing and support.  Accordingly, the Court **DENIES** Plaintiff's request to reinstate the previously dismissed federal malicious prosecution claim, (doc. 33-1, p. 18).

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendants Winston and McBride's Motion for Summary Judgment, (doc. 30), and **DENIES** Plaintiff's request (contained in his Response to the Motion for Summary Judgment) for reinstatement of his previously dismissed federal malicious prosecution claim, (doc. 33-1).  It appears that the sole remaining claim is Plaintiff's Fourth Amendment malicious prosecution claim against Defendant Robbins (asserted within Count I).  Accordingly, the Court **DIRECTS** the Clerk of Court to **TERMINATE** Defendants Winston and McBride as Defendants in this case and to update the docket of the case accordingly.

**SO ORDERED**, this 30th day of September, 2021.


R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA